UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
|    SHAKEEL S. KHAN | ) | Case No. 10-15387-SSM |
|    AYESHA KHAN | ) | Chapter 7 |
| | ) | |
|             Debtors | ) | |
| | ) | |
| RACETRAC PETROLEUM, INC., | ) | |
| | ) | |
|             Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 10-1431 |
| | ) | |
| SHAKEEL S. KHAN, *et al.* | ) | |
| | ) | |
| | ) | |
|             Defendants | ) | |

**MEMORANDUM OPINION**

      This is an action to determine the dischargeability of a claim arising from the disappearance of gasoline sale proceeds from a service station operated by the defendants under an agreement with the plaintiff. A trial was held without a jury on May 12, 2011. The plaintiff and the defendants were each represented by counsel. At the outset of the trial, the court granted the plaintiff's motion to voluntarily dismiss its claims against defendant Ayesha Khan, leaving only Shakeel Khan as a defendant. Following presentation of the evidence, the court took the issues under advisement and is now prepared to rule.[1] This opinion constitutes the court's

---

[1] Both parties have submitted helpful post-trial briefs.

1

findings of fact and conclusions of law under Rule 52(a), Federal Rules of Civil Procedure, and Rule 7052, Federal Rules of Bankruptcy Procedure.

## Background and Findings of Fact

Shakeel S. Khan and Ayesha M. Khan ("the debtors") are husband and wife. They filed a joint petition for relief under chapter 7 of the Bankruptcy Code in this court on June 25, 2010, and received a discharge of their dischargeable debts on October 12, 2010. On their schedules, they listed $574,825 in unsecured debts, of which the largest was the $533,083 claim—then the subject of state court litigation—of Racetrac Petroleum, Inc. ("Racetrac"). Racetrac filed the present adversary proceeding on October 3, 2010. The complaint, as originally pleaded, sought a determination that the debtors' liability to Racetrac was excepted from discharge on the grounds of fraud, fiduciary defalcation, embezzlement, and willful and malicious injury to property, and entry of a money judgment for $273,083 in compensatory damages and $250,000 in punitive damages. Prior to trial, Racetrac voluntarily dismissed the fraud and embezzlement claims, leaving only the claims for fiduciary defalcation and willful and malicious injury to property.

The evidence at trial showed that the debtors submitted an application to run a Raceway Gasoline Service Station on May 24, 2007. At that time, Shakeel Khan was employed with the United States Postal Service in Alexandria, Virginia. The debtors expected that evaluation of their application would take some time. However, Racetrac promptly approved the application and granted them the opportunity to operate a gasoline service station and associated convenience store located at 1907 Julian R. Allsbrook Highway, Roanoke Rapids, North Carolina. Upon learning that their application had been approved, Shakeel Kahn took the Gasoline Services Agreement, the Lease Agreement, and the Guaranty to his lawyer, John

2

Dutton, for his review. After obtaining Mr. Dutton's approval, the debtors executed the three agreements on July 3, 2007. Although the debtors created a North Carolina limited liability company called BILA, LLC, as ostensible operator of the store for federal income tax purposes, they executed the three agreements in a personal capacity.

Because the debtors were not immediately prepared to move to North Carolina, Racetrac permitted Shakeel Khan's brother, Adeel Khan, to manage the station. Adeel received training from Racetrac representative Peter Bowling. Shakeel Khan, although present at the time of Mr. Bowling's visit, did not participate in the training. Adeel began managing the station on a daily basis in September 2007. Shakeel Khan had the ability to monitor the station's sales via Racetrac's intranet, but did so only two or three times during his length of ownership. He did, however, communicate with Adeel on a regular basis regarding the general operations of the station.

Racetrac had an unusual arrangement with the debtors, who were merely Racetrac's agents for the sale of gasoline but operated the convenience store for their own benefit. Under the terms of the Gasoline Services Agreement, the debtors never took ownership of the gasoline or the gasoline sales proceeds. Instead, the debtors agreed to sell the gasoline on Racetrac's behalf (at prices determined by Racetrac) and to maintain the proceeds in an account to which Racetrac had access. The Gasoline Services Agreement further provided:

> Title to the proceeds of all sales by Contract Operator of gasoline shall at all times be vested in and belong to Racetrac and any possession and control thereof by Contract Operator shall be *as trustee and agent for the use and benefit of Racetrac*, and Contract Operator shall not use Racetrac Funds for purchases, operating expenses, or otherwise. Contract Operator acknowledges that Contract Operator owes *a duty of trust* to Racetrac in the collection and safe keeping of all funds collected for such sales of fuel, and acknowledges that Contract Operator *is serving in a fiduciary relationship* with Racetrac.

3

Agreement § 5(A), page 11 (emphasis added). Although the agreement required that the funds be deposited in an account *accessible* to Racetrac, it did not require that the funds be placed in a *segregated* account, and Racetrac was at all times aware that the store sales and the gasoline sales were deposited into a single bank account at Southern Bank that was titled in the name of "M-Mart."[2] As a part of the arrangement, the debtors agreed to facilitate the sale of gasoline in a number of ways, including: (1) reporting the price of gasoline from the surrounding area gasoline stations to Racetrac headquarters at 8:00 a.m. each morning, (2) recording all gasoline sales via the "Ruby" cash register system, which relayed sales information in real time directly to Racetrac, and (3) ensuring the physical maintenance of the gasoline pumps by doing tasks such as stocking the pumps with paper to print customers' receipts. In exchange for these services, the debtors received three and a half cents per gallon of gasoline that was sold.[3] Racetrac swept the remaining gasoline sale proceeds from the M-Mart account at Southern Bank each day based on the sales recorded via the Ruby cash register system.

In addition to receiving 3.5 cents per gallon of gasoline sold, the debtors operated a convenience store on the premises from which they were entitled to all of the net profits. Under the Lease Agreement, they paid rent to Racetrac of $7,200 per month and posted a $25,000 security deposit. The debtors were required to stock the store with inventory having a minimum

---

[2] M-Mart did have a separate account at Southern Bank for state lottery sales proceeds.

[3] Because the amount the operator was allowed to retain was a fixed number of cents per gallon, while the merchant fees charged to the operator for accepting credit card payments were determined as a percentage of the sales price, a sufficient run-up in gasoline prices could result in the operator paying out more to the credit card company than he received from Racetrac for operating the pumps. Although this was apparently a source of some discontent among Racetrac operators, it has no direct bearing on the issues before the court.

wholesale value of $65,000.  In essence, the debtors and Racetrac had a symbiotic relationship. Racetrac benefitted from the debtors' willingness to sell gasoline on its behalf, and the debtors benefitted from being able to sell convenience store goods to customers who came to purchase gasoline.

The debtors, through Adeel, operated the station from September 2007 until May 2008 without incident.  On May 14, 2008, however, when attempting to sweep gasoline sale proceeds to which it was entitled according to the Ruby cash register system, Racetrac noted a deficiency of $4,151.68 in M-Mart's Southern Bank account.  Racetrac immediately dispatched a representative to the station to inquire about the deficiency, and recovered $4,151.68 from Adeel in the form of a certified check.

Over the period from May 22, 2008, to May 27, 2008—which encompassed the Memorial Day weekend—Racetrac again attempted to sweep the gasoline sale proceeds to which it was entitled according to the sales recorded in the Ruby cash register system, but was unable to do so because of insufficient funds in M-Mart's Southern Bank account.  After the weekend, Racetrac discovered that the station was no longer open for business and that the Ruby cash register system had been damaged.  Because the gasoline sales had not been properly recorded, Racetrac relied on underground tank gauges referred to in the testimony as a "Veeder-Root"[4] to determine the amount of gasoline sale proceeds to which it was entitled.  The Veeder-Root gauges allowed Racetrac to measure the amount of gasoline stored underground.  By subtracting the amount of

---

[4] According to its web site, The Veeder-Root Company "is the world's leading supplier of automatic tank gauging and fuel management systems" and "presently has tank monitoring systems in more than 500,000 underground storage tanks around the globe." Veeder-Root, http://www.veeder.com/page/Company_VR (last visited July 22, 2011).

gasoline remaining in the tanks according to the Veder-Root system from the total amount of gasoline that was delivered to the station, Racetrac determined that it was owed a total of $256,807.13 in gasoline sale proceeds based on the price that the debtors were required to charge.[5]

The bank statements for the period immediately prior to the closing of the station show that $164,000 was transferred out of the M-Mart account in the five-day period from May 25 to May 29, 2008. No evidence was presented as to who initiated the transfers or what became of the funds. Subsequent to the closing of the station and the disappearance of the gasoline sale proceeds, Adeel visited the debtors and their family on a frequent basis. However, the debtors took no legal action against him for taking the funds and last had contact with him in February 2010. Adeel is presently believed to be in Pakistan.

                          Conclusions of Law and Discussion

                                          I.

Racetrac asserts that the loss it suffered from the diversion of the gasoline sale proceeds is excepted from discharge either as a fiduciary defalcation or a willful and malicious injury to property. This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. A determination of the dischargeability of a debt is a core proceeding in which a final judgment or order may be entered by a bankruptcy judge. 28 U.S.C.

---

[5] There is a hint in the testimony that prices at the pumps had been lowered below the prices set by Racetrac in order to attract customers to the station, but the proffered evidence that would have fleshed this out was excluded on hearsay grounds.

§ 157(b)(2)(I). Venue is proper in this district under 28 U.S.C. § 1409(a). The defendants have been properly served and have appeared generally.

## II.

The court will first address Racetrac's claim that its quarter-million dollar loss is excepted from discharge as a willful and malicious injury. In this connection, a chapter 7 discharge does not discharge an individual debtor from debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." § 523(a)(6), Bankruptcy Code. The Supreme Court has explained that "willful," as used in § 523(a)(6), requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (emphasis in original). The requirement that the conduct be "malicious," however, does not require that a debtor bear subjective ill will toward, or specifically intend to injure, his or her creditor; it is sufficient that a debtor's injurious act is done "'deliberately and intentionally in knowing disregard of the rights of another.'" *First Nat'l Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664 (4th Cir. 1995) (quoting *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1010 (4th Cir. 1985)). Conversion can constitute a willful and malicious injury to property for the purpose of § 523(a)(6). *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 331-32, 55 S.Ct. 151, 153, 79 L.Ed 393 (1934); *Harmon v. Scott (In re Scott)*, 203 B.R. 590, 598 (Bankr. E.D. Va. 1996); *Richmond Metropolitan Hosp. v. Hazelwood (In re Hazelwood)*, 43 B.R. 208, 213 (Bankr. E.D. Va. 1984). The burden of proof is on the objecting creditor, and the standard of proof is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Racetrac offers no direct proof that Shakeel Khan participated in the taking of the gasoline sales proceeds over the Memorial Day weekend. Instead, it simply invites the court to speculate that more likely than not, Shakeel Khan had some level of involvement in the disappearance of the sales proceeds, since he received his brother into his home after the incident and has made no attempt to recover the funds from him.[6] While his passivity in this respect is both puzzling and disappointing, the court, after hearing and weighing his testimony, is unable to extrapolate from a misplaced sense of family loyalty to actual complicity in Adeel's conduct. Although preponderance of the evidence is not a heavy burden, it nevertheless requires more than conjecture or speculation. For that reason, judgment will be entered in favor of Shakeel Khan on the claim of willful and malicious injury.

III.

The court will next address Racetrac's claim that its quarter-million dollar loss is excepted from discharge as a fiduciary defalcation. Among the debts excepted from discharge of an individual debtor are debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." § 523(a)(4), Bankruptcy Code. To succeed on a claim of fiduciary defalcation, "a creditor must ordinarily make a two-part showing: (1) that the debt in issue arose while the debtor was acting in a fiduciary capacity; and (2) that the debt arose from the debtor's fraud or defalcation." *Kubota Tractor Corp. v. Strack (In re Strack),* , 524 F.3d 493, 497-98 (4th Cir. 2008) (citations omitted). The court will address each element in turn.

---

[6] Racetrac has obtained a judgment against Adeel Khan but has been unable to collect on it.

A.

In *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the Supreme Court narrowly defined the scope of those individuals who could be held to act in a fiduciary capacity. In that case, the debtor, who was an automobile dealer, took delivery of an automobile and executed, among other documents, a "trust receipt" under which the debtor acknowledged "receipt of the automobile, and agree[d] to hold it . . . for the purpose of storage, and not to sell, pledge or otherwise dispose of it except upon consent in writing." *Id.* at 330, 55 S.Ct. at 152. Despite the suggestive name of the "trust receipt" signed by the debtor, the Court declined to find that the debtor's failure to remit the proceeds of the sale from the automobile constituted "defalcation while acting ... in any fiduciary capacity" under the former Bankruptcy Act of 1898, and instead held the substance of the transaction to be that of a debtor and its creditor. *Id.* at 334, 55 S.Ct. at 154. The Court explained that "[t]he resulting obligation [was] not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust." *Id.* In this respect, *Davis* is consistent with more than a century of Supreme Court precedent that has narrowly restricted the scope of who is a "fiduciary" for dischargeability purposes. In *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844), for example, the Supreme Court considered the issue of whether a factor who retained his principal's money from the sale of 150 bales of cotton was a fiduciary within the meaning of the Bankruptcy Act of 1841, which allowed discharge of all debts except those "created in consequence of a defalcation as a public officer, or as executor, administrator, guardian, or trustee, or *while acting in any other fiduciary capacity*." *Id.*, 43 U.S. (2 How.) at 207 (emphasis added). In finding that the factor's debt was dischargeable, the Court wrote:

9

> If the [A]ct embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this *is not* the relation spoken of in the first section of the [A]ct.

*Id.,* 43 U.S. (2 How.) at 208 (emphasis added). *See also Upshur v. Briscoe,* 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891) (holding, in case decided under Bankruptcy Act of 1867, that debtor who was appointed as donor's attorney in fact to pay $700 per year to a specified beneficiary from $10,000 delivered to him for that purpose was not acting in a "fiduciary character" for purpose of dischargeability). As a result, courts within this district have consistently held that the term "fiduciary" as used in § 523(a)(4) is restricted to

> the class of fiduciaries including trustees of specific written declarations of trust, guardians, administrators, executors or public officers and, absent special considerations, does not extend to the more general class of fiduciaries such as agents, bailees, brokers, factors, and partners.

*Sager v. Lewis (In re Lewis)*, 94 B.R. 406, 410 (Bankr. E.D. Va. 1988); *Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 852 (Bankr. E.D. Va. 1986); *Harmon v. Scott (In re Scott)*, 203 B.R. 590, 596-97 (Bankr. E.D. Va. 1996); *KMK Factoring, L.L.C., et al. v. McKnew (In re McKnew)*, 270 B.R. 593, 625 (Bankr. E.D. Va. 2001).[7]

---

[7] The reason for narrowly restricting the definition of fiduciary is straight-forward, namely that "defalcation" does not require fraud or misappropriation, but is simply "'the failure to meet an obligation' or 'a nonfraudulent default.'" *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001) (quoting Black's Law Dictionary 427 (7th ed. 1999)). Hence, "negligence or even an innocent mistake which results in misappropriation or failure to account is sufficient." *Uwimana*, 274 F.3d at 811. Of course, a non-innocent misappropriation would be non-dischargeable even if the debtor was not a "fiduciary" within the meaning of § 523(a)(4), as that sub-section separately excludes from discharge debts grounded in larceny or embezzlement. *See Clark v. Taylor (In re Clark),* 58 B.R. 849 (Bankr. E.D. Va. 1986) (holding that co-owner who sold horse and kept other co-owner's share of proceeds was guilty of embezzlement within

B.

Racetrac, however, asserts that the Fourth Circuit's opinions in *Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F.3d 266 (4th Cir. 2002) and *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493 (4th Cir. 2008) compel a finding that Shakeel Kahn was a fiduciary for the purpose of § 523(a)(4). In *Ellison*, the Court held that the liability of a travel agency's officers and directors who "single-handedly" participated in the agency's breach of fiduciary duty by not remitting proceeds from the sale of airline tickets, and who were liable for damages as guarantors, was properly excepted from discharge under § 523(a)(4). And in *Strack* the Court held that the liability of the president of a farming equipment dealer that had guaranteed the dealership's obligations to a manufacturer under a floor plan financing agreement—and who had not complied with a provision requiring the dealer to segregate the proceeds of sale and hold them in trust for the manufacturer but used the funds to pay other business expenses—was excepted from discharge under § 523(a)(4) as a fiduciary defalcation.

The defendant, however, says that this case is distinguishable from both *Ellison* and *Strack* because the Gasoline Services Agreement—despite its reference to the sales proceeds being held by the operator "as trustee and agent"—did not require that they be *segregated* from the operator's own funds, but merely required that they be placed into an account that Racetrac could sweep. In *Ellison,* by contrast, the Agent Reporting Agreement required the travel agency to place the proceeds from the sale of airline tickets "in a *trust account* . . . for the benefit of ARC" (emphasis added) and to report to ARC weekly on the ticket sales made to consumers,

---

meaning of Sec. 523(a)(4)). Thus, whether or not a debtor is a fiduciary is significant only in the sense that it defines the level of culpability needed to except the debt from discharge.

with only ARC having the right to draft the account. *Ellison*, 296 F.3d at 268.  And in *Strack*, the agreement between the dealership and the manufacturer provided, in pertinent part, that "[u]ntil [the dealer] shall have made settlement with [Kubota] of the full amount due to [Kubota] with respect to any [equipment] disposed of by [the dealer], [the dealer] *shall segregate the proceeds and hold the same in trust for [Kubota]*." 524 F.3d at 495 (emphasis added).  Although the Gasoline Services Agreement in this case prohibits use of the sales proceeds for the payment of operating expenses, it does not require that they be paid into a "trust account,"[8] nor does it prohibit the commingling of the gasoline sales proceeds with the funds from the convenience store.  It also does not prohibit payments out of the account for operating expenses so long as sufficient funds remain to cover the gasoline sales.  The evidence is undisputed that Racetrac knew of the commingling and never objected to it.  Indeed, had it been otherwise, a customer who wished to use a credit card to pay for both his gasoline purchase and a sandwich and soft-drink would have to have had his card swiped twice.  As the Supreme Court observed in *Davis,* an obligation "is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust." *Davis*, 293 U.S. at 334, 55 S.Ct. at 154.  This court agrees, therefore, that this case is distinguishable from *Ellison* and *Strack,* and that in the absence of an obligation to segregate the gasoline sales proceeds from the operator's own funds,

---

[8] To be sure, Racetrac in its pleadings, memoranda, and oral argument at trial insistently refers to the Southern Bank account as a "trust account."  But that terminology is nowhere used in the Gasoline Services Agreement nor in any other document signed by the debtors.  Nor, for that matter, is the account titled or designated in a way that would imply any special purpose or restriction.  More fundamentally, Racetrac's knowledge of, and acquiescence in, the commingling of the debtors' own funds with the supposed trust *res* is fundamentally at odds with the concept of a "trust account," which by its very term implies an account holding funds that are separate from the trustee's general funds.

the Gasoline Services Agreement, despite its formulaic use of the word "trustee" and "in trust," did not evidence an intent to create a true trust, but merely an agency. As the Fourth Circuit explained in *Strack*, a trust arises "'if the intention is that the money shall be kept or used *as a separate fund* for the benefit of the payor or a third person.'" *Strack*, 524 F.3d at 499 (emphasis added) (quoting *Broaddus v. Gresham*, 26 S.E.2d 33, 37 (Va. 1943)). And given the Supreme Court's consistent holdings that agents and factors[9] do not act in a "fiduciary capacity" for the purpose of non-dischargeability, the court can only conclude that Shakeel Khan was not a fiduciary within the meaning of § 523(a)(4).

C.

Because the court does not find that Shakeel Khan was a fiduciary within the meaning of the statutory exception to discharge, the court need not reach the issue of whether a defalcation occurred. As noted, defalcation does not require embezzlement or misappropriation; "negligence or even an innocent mistake which results in misappropriation or failure to account is sufficient." *Uwimana*, 274 F.3d at 811. Nevertheless, the acts constituting the failure to account must be fairly laid at the fiduciary's door. A fiduciary is certainly held to a prudent person standard in

---

[9] Although the term "factor" today is most commonly applied to a purchaser of accounts receivable, in the 19th Century it referred to a mercantile agent employed to buy or sell goods for another for a commission. David B. Tatge, Jeremy B. Tatge, David Flaxman, American Factoring Law, 2011 Supplement, Chap. 1 ("Factors, . . . at least before 1890, were mercantile agents entrusted with the physical possession of their principal's goods or documents of title to the goods, for purposes of sale, and who sold on commission."); Oxford English Dictionary, "Factor," defn. 4a. "[A] factor is distinguished from an ordinary agent or broker, in having actual possession of the goods he deals in, and trading in his own name." *Id.*;. Here the debtors were placed in possession of Racetrac's gasoline for the purpose of selling it for a commission of 3.5 cents on the gallon, and their economic relationship to Racetrac does not differ in any meaningful way from that of the cotton factor—who was held not to be acting in a fiduciary capacity when selling his principal's goods—in *Chapman v. Forsyth*.

safeguarding the funds and property which have been entrusted to him but is not liable for losses that result from events beyond his reasonable control.  In *Uwimana, Ellison,* and *Strack*, this was not an issue, because in each of those cases the misappropriation or misapplication of the funds was the direct result of the debtor's own actions.  Here, however, the misappropriation appears from the evidence to be the result of Adeel Khan's actions.  As a general proposition, a trustee "is not liable to the beneficiary for the acts of agents employed by him in the administration of the trust." Restatement of the Law of Trusts 2d, § 225(1).  This is subject to the qualification that the trustee will be liable to the beneficiary for any act of an agent which, if done by the trustee, would constitute a breach of trust if, among other things, the trustee delegates acts "which he was under a duty not to delegate," "does not exercise proper supervision over the conduct of the agent," or "neglects to take proper steps to compel the agent to redress the wrong." *Id.*, § 225(2)(b), (d), (f).  Certainly, Shakeel Khan could fairly be faulted for failing to take reasonable steps to recover the funds from his brother, although whether more vigorous action would actually have resulted in the recovery of the funds is less clear.  Whether he could be faulted for not checking daily on the operations of the station through the remote access to the gasoline sales data and the bank accounts that was available to him is a closer question, particularly given the lack of any evidence that Racetrac was relying on Shakeel Khan, rather than Adeel Khan (whom it trained), as the daily manager of the station.  But since the court is unable to conclude that Shakeel Khan was actually a trustee of Racetrac's funds, the court need not finally resolve those issues.

D.

A separate judgment will be entered determining that Shakeel Khan's liability to Racetrac is dischargeable and has been discharged.

Date: _____          _____
                                      Stephen S. Mitchell
Alexandria, Virginia                  United States Bankruptcy Judge


Copies to:

Paul J. Feinman, Esquire
Petty, Livingston, Dawson & Richards PC
P.O. Box 1080
Lynchburg, VA 24505
Counsel for the plaintiff

Jeffrey A. Vogelman, Esquire
Thomas, Ballenger, Vogelman & Turner
124 South Royal Street
Alexandria, VA 22314
Counsel for the defendants